UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

MIGRANT JUSTICE and MATT CAMERON,    )
    )
        Plaintiffs,    )    Case No. 2:17-CV-197
    )
        v.    )
    )
UNITED STATES DEPARTMENT OF    )
HOMELAND SECURITY, UNITED STATES    )
CUSTOMS AND BORDER PROTECTION, and    )
UNITED STATES IMMIGRATION AND    )
CUSTOMS ENFORCEMENT,    )
    )
        Defendants.    )
    )

## NINTH JOINT STATUS REPORT

On December 27, 2017, this Court granted the parties' Stipulated Schedule For Status

Reports To The Court And Request To Stay Local Rule 26(a).  Doc. Nos. 13, 15.  Pursuant to the

Order, the parties submit this Joint Status Report to update the Court on Defendants'

productions.  This Joint Status Report is the parties' ninth such report; under the stipulated

schedule, subsequent reports will be filed every sixty days.  The parties' Eighth Joint Status

Report was filed on July 19, 2019.  The Court convened a status conference on July 2, 2019, at

which the parties advised the Court that they were continuing to negotiate issues related to

DHS's searches and document production and ICE's and CBP's production of *Vaughn* indexes.

The Court ordered the DHS process to commence and the parties to continue with document

production.  It also advised that it would schedule a follow-up conference toward the end of

summer.  Doc. No. 55.  The Court has set another status conference for September 23, 2019.

This case involves two FOIA requests, the first submitted April 26, 2017 ("April

Request"), containing requests Nos. 1-6, and the second submitted July 17, 2017 ("July

1

Request"), containing requests Nos. 1-3.  This litigation was filed against Defendants

Department of Homeland Security ("DHS"), U.S. Immigration and Customs Enforcement

("ICE"), and U.S. Customs and Border Protection ("CBP") on October 11, 2017.  Doc. No. 1.

The Complaint was amended on December 19, 2017.  Doc. No. 11.

      This Joint Status Report is divided into two sections that separately provide the respective

positions of the parties.  Plaintiffs provided Defendants' counsel with their position statement, as

well as the preceding opening paragraphs, for review on the evening of September 16, 2019

(EST). After reviewing Plaintiffs' position, Defendant did not sign on, but did not call into

attention anything that was inaccurate or mischaracterized therein.  Defendants provided

Plaintiffs' counsel with their position statement this evening on September 17, 2019 (EST).

Given the timeframe, Plaintiffs did not have the opportunity to assess or respond to the

recitations therein, but will be prepared to respond to them during the upcoming status

conference scheduled for September 23, 2019.  Lastly, this paragraph was added to this Joint

Status Report in the evening of September 17, 2019, by Plaintiffs' counsel. Given the timeframe,

this paragraph was added without the opportunity for review by Defendants' counsel.

Plaintiffs' Position:

      This Court has ordered DHS to produce 500 documents per month responsive to April

Request Nos. 1-4 and July Request Nos. 1-2.  Doc. Nos. 25, 31.  DHS has since produced to

Plaintiffs documents on the following dates: July 2, 2018, consisting of 580 pages (13

documents); July 18, 2018, consisting of 674 pages (9 documents); and August 20, 2018,

consisting of 1040 pages (11 documents), which the agency maintained was its final release

responsive to the April Request.  DHS produced these documents from a random sample of 35

custodians in the Front Office and Office of Policy.  On July 11, 2019, counsel for Plaintiffs conferred with counsel for DHS as well as FOIA staff within DHS to discuss which additional offices and/or custodians will be searched in response to April Request Nos. 1-4 and July Request Nos. 1-2.  Plaintiffs also provided to DHS proposals for searches corresponding to April Request No. 5.  DHS indicated that it would submit a "tasker" to the relevant staff as soon as possible and would have more information for Plaintiffs as to all outstanding requests in early August.  Plaintiffs conferred with Defense counsel in a phone call on September 11, 2019; Defense counsel did not yet have more information for Plaintiffs on the status of the tasker or outstanding requests.

ICE and CBP maintain that they have completed document productions as to all requests other than April Request No. 6 and July Request No. 3, requests that Defendants assert are outside the scope of their obligations under FOIA.  The parties are negotiating a proposed schedule for production of *Vaughn* indexes and summary judgment briefing.  On July 2, 2019, ICE and CBP proposed producing *Vaughn* indexes based on a sampling of the documents they had produced or withheld—500 pages for ICE and 200 pages for CBP.  Plaintiffs reviewed each of the redacted and withheld documents to determine an adequate sample size.  Based on this review, by email dated July 19, 2019 and again July 22, 2019, Plaintiffs counter-proposed a sample of 1500 pages for ICE and 750 pages for CBP ("July Proposal").

On August 9, 2019, the parties had a telephonic conference together with ICE counsel, who explained ICE's FOIA review system and characterized it as an extremely time-intensive endeavor.  ICE counsel explained that it may accelerate ICE's process if Plaintiffs were to exclude categorically any particular FOIA exemption from the index and proposed a two-stage *Vaughn* process, with the initial *Vaughn* covering a sample of 500 pages, and a second *Vaughn*

index covering another unspecified number of pages after Plaintiffs had reviewed the first *Vaughn* index.  By email dated August 19, 2019, Plaintiffs counter-proposed to ICE an initial *Vaughn* index of 750 pages, to be followed by a second *Vaughn* index for an unspecified but smaller number of pages.  Additionally, Plaintiffs explained that they are amenable to excluding from the index any personally identifying information under 5 U.S.C. 552(b)(6) and (b)(7)(C), other than proper names and anything after the "@" in an email address, in order to accelerate ICE's timeline.  Plaintiffs' proposal of 750 pages for the initial *Vaughn* index is based on their review of each document ICE has produced and the importance of understanding the redactions in those documents.

Plaintiffs sought a response from Defense counsel as to the August 19th proposal to ICE and the July Proposal to CBP via email on September 3, 2019 and September 9, 2019 and did not receive one.  Plaintiffs called Defense counsel on September 11, 2019, and Defense counsel indicated that for ICE, starting with a 750 page *Vaughn* index would take about 6-7 months to complete and would prefer to start with a 500 page *Vaughn* index.  Plaintiffs' position as to ICE remains at a proposal of an initial *Vaughn* index of 750 pages to be followed by a second *Vaughn* index for a smaller number of pages.

On the September 11, 2019 call, Defense counsel communicated CBP's counter-proposal of a two-stage *Vaughn* process, with the initial *Vaughn* covering a sample of 250 pages, and a second *Vaughn* index covering another unspecified number of pages after Plaintiffs had reviewed the first *Vaughn* index.  By email dated September 13, 2019, Plaintiffs proposed to CBP a two-stage *Vaughn* process, with both stages to include a *Vaughn* index of 300 pages.  This is Plaintiffs' current position.

Defendants' Position:

    1.  DHS' New Search

By way of background for this Court, the DHS Privacy Office Disclosure team is responsible for receiving, tracking, processing, and closing all FOIA requests received by the DHS Privacy Office.  The DHS Privacy Office's FOIA staff currently consists of a Deputy Chief FOIA Officer, a Senior Director of FOIA Operations and Management, four (4) director level positions, four (4) full-time litigation analyst positions (to include two (2) contractors) one (1) part-time litigation analyst, five (5) FOIA specialist positions, and eleven (11) contractors.  At this time, six (6) of the DHS Privacy Office FOIA employees are new, with little to no experience processing records for complex FOIA requests and one (1) of the FOIA specialist positions is vacant.  Additionally, one of the full-time litigation analysts will be deployed to the Southern border in support of the Department's surge efforts in that region, and the part-time litigation analyst has tendered her resignation, effective at the beginning of October 2019.

FOIA specialists handle all aspects of the FOIA request process.  They receive new FOIA requests, along with referrals and consultation requests from other agencies or DHS components, log those new FOIA requests into the FOIA case tracking system, and send out search taskers to various offices compelling them to search for records.  Once those searches are complete, FOIA specialists review any records located and make withholding determinations, redacting any exempt information pursuant to the FOIA exemptions.  FOIA specialists also send out FOIA responses and work on other FOIA projects for the DHS Privacy Office, as needed.

In FY 2018, the DHS Privacy Office received 1,448 requests, a seven percent increase compared to FY 2017, and processed 1,435 requests, a 39 percent increase compared to FY 2017.  DHS Privacy Office's backlog for FY 2018 ended at 511 requests, a 17 percent increase

compared to FY 2017.  About two-thirds of the requests received by the DHS Privacy Office are categorized as complex requests, meaning that they require a wide-ranging search, frequently across multiple offices, and involve a large number of records.

Furthermore, during that same time the DHS Privacy Office has experienced an unanticipated spike in FOIA litigation.  The DHS Privacy Office is currently involved in 77 active lawsuits, 29 of which were filed in FY 2019, and is responsible for assisting U.S. Customs and Border Protection (CBP) by processing records in response to a Court order requiring the production of approximately 3,500 pages per month.

The DHS Privacy Office is currently taking steps to address the staffing shortfall, including hiring a Senior Director to supervise the FOIA Litigation team, and working to bring on additional full-time federal employees and contractors.  However, the process to hire additional staff and to get those employees through the clearance process can be lengthy and unpredictable, and we are unable to predict when staff members may decide to seek employment outside of the Privacy Office.

As detailed above, DHS is operating under tremendous resource constraints. A representative from the DHS Privacy Office and OGC did participate in a conference call with Plaintiffs' counsel in July to discuss the two FOIA requests and resolve any issues with regard to those searches.  Although DHS had expected to task the search by August, because of strained resources and competing priorities, DHS was not able to do prepare a search tasker until the date of this filing and is in the process of conferring further with Plaintiff to ensure the search tasker is tailored to Plaintiff's specifications.  DHS will initiate the search upon receiving feedback from the plaintiff as to the proposed search tasker.  Again, this search tasker is to conduct a

search in addition to the extensive search previously conducted by DHS where approximately 2500 documents have been produced to Plaintiffs as a result of that prior search.

2.  CBP's Review of the Plaintiffs' FOIA's and Creation of *Vaughn* Index.

By way of background for this Court, with regard to CBP's initial search and review for responsive documents to Plaintiffs' two FOIA requests, it is noted that CBP does *not* maintain a privilege log in connection with any FOIA request.  While Office for Chief Counsel (OCC) at CBP is responsible for the creation of a *Vaughn* index, initial review of responsive records and any redactions thereto are completed by CBP's FOIA Division in Washington, DC, in close consultation with the client, in this case, Border Patrol in Vermont.  The initial review of responsive records is done through the use of either adobe or an eDiscovery platform called Clearwell.  Together, they review each document, line-by-line, and make redactions based on the applicable FOIA exemptions.  They do *not*, however, keep a separate record or log of each redaction, nor is one produced by any system.  Each redaction is identified with an exemption that serves to later identify the basis of the redaction.  For example, if something was redacted as law enforcement sensitive, then it would state on the redaction "b(7)(e)", but contain no further explanation therein.  FOIA Division in Washington, DC and the client (Border Patrol, VT) consult with CBP's counsel in Boston while completing redactions, if necessary, and CBP Boston will review the production before it is released.

For CBP, the creation of a *Vaughn* index requires manual review of both the redacted and un-redacted versions of each page of the production.  For each redaction, CBP locate the underlying information, complete a legal sufficiency review, and record the justification for each FOIA exemption used.  In CBP's exemption explanations in the *Vaughn*, it must ensure to describe the general substance of the underlying information with enough detail to satisfy

Plaintiff (and the Court), without actually divulging anything sensitive, confidential, or privileged.  This process also includes contact with the client (Border Patrol in VT) to confirm information and request additional documents, if necessary.  The end product is a *Vaughn* document identifying each record, the FOIA exemptions contained therein, and the corresponding explanations.  The process requires many hours, as it involves manual review, line-by-line, of two versions of each page, correspondence with the client, and legal review and analysis specific to each occurrence of a redaction.  One document may contain many redactions, each of which must be addressed separately.  There is no software or program that automates or assists in any part of this process.  CBP notes that a typical *Vaughn* accounts for only 10% of the actual production.  A *Vaughn* accounting for approximately 66% of the production, as Plaintiff requests here, is highly unusual.

As they require legal review, *Vaughn's* are handled solely by CBP's Office of Chief Counsel which, in this case, is being handled by the OCC field office in Boston.  At most, three Boston OCC attorneys will be assigned to assist in drafting the *Vaughn* for this case.  Nonetheless, while OCC attorneys are responsible for assisting in FOIA litigation and creating *Vaughn's*, this is only one small aspect of their practice.  In fact, CBP Boston does not have attorneys dedicated to FOIA work alone, and no one attorney can devote more than a fraction of their time to working on a *Vaughn* index in light of their other legal responsibilities.  Once a draft *Vaughn* is complete, it must then be reviewed and receive concurrence from CBP's FOIA Division in Washington, DC, which may take up to several weeks to obtain.  The Boston OCC office is currently handling four ongoing FOIA litigation matters.

The CBP Boston OCC recently completed a *Vaughn* index that consisted of 245 pages.  Three attorneys were assigned to that case and it took approximately two months to complete.  For a *Vaughn* of 600 pages as proposed by Plaintiffs, CBP Boston OCC would need approximately 6 months to complete that task.  Accordingly, CBP proposed a representative sampling of 200 pages to Plaintiffs but that proposal was recently rejected with Plaintiffs' counterproposal of 600 pages. In typical circumstances, a *Vaughn* is produced at the time the party files its motion for summary judgment, not beforehand.

       3.      <u>ICE's Creation of *Vaughn* indexes, and negotiations with Plaintiff</u>

By way of background for this Court, with regard to ICE's initial search and review for responsive documents to Plaintiffs' two FOIA requests, it is noted that ICE also does *not* maintain a privilege log in connection with any FOIA request.  The reason is twofold: first, FOIA productions in a litigation context do not constitute discovery and, therefore, do not require privilege logs; and second, the technology used by ICE FOIA does not allow for contemporaneous privilege log creation, instead relying on manual *Vaughn* indexes, which are created for the purpose of briefings.

Expanding on this second point, the ICE FOIA Office tracks all of the requests it receives, both directly and by referral, through FOIAXpress, which is ICE FOIA's case management system.  As explained to Plaintiffs during a conference call on August 9, 2019, FOIAXpress is a platform solely built for tracking and processing FOIA requests and is used by many agencies within DHS.  When ICE FOIA and the ICE Office of the Principal Legal Advisor (OPLA) Government Law information Division (GILD) receive a litigation matter, they work in conjunction to task searches to the appropriate offices and organize the potentially responsive records.   Before importing documents to FOIAXpress, the ICE FOIA Office will use a separate

eDiscovery program called Relativity to initially process documents. This software allows ICE FOIA to remove duplicate documents and group email threads, thereby reducing overall page counts and facilitating faster and more efficient document production.  Relativity can also facilitate narrowed searches within document sets, which is a function that FOIAXpress lacks.

Because FOIAXpress and Relativity are not interoperable systems, the documents cannot be transferred or shared between the systems.  After being run through Relativity, documents are exported from Relativity in native file format, and then are imported to FOIAXpress.  This process, among other things, destroys document metadata and the ability to keep documents grouped in discrete bundles.  Therefore, each responsive page in FOIAXpress is considered a single document and is not readable or searchable while in FOIAXpress.  The missing metadata means that the system cannot auto-populate the document title or author.  To apply redactions, the ICE FOIA Office and/or OPLA GILD must draw a box around select portions of the document and choose the applicable FOIA exemption(s) from an auto-populated menu. This list of FOIA exemptions is organized numerically and does not include any further information for the applied FOIA exemption chosen.  For example, if information was redacted pursuant to the attorney work product privilege, then it would state on the redaction "b(5)", but contain no further explanation therein.  Neither the ICE FOIA processor nor the OPLA GILD attorney keeps a separate record or log of each redaction as documents are produced given that the *Vaughn* index, which is generated typically at the end of production, serves to document and describe the reason for the applied withholdings. This is the *Vaughn's* purpose.

In creating the *Vaughn* index, FOIAXpress does not have the capacity to run a report that would produce a *Vaughn* shell or any other helpful templates.  Therefore, to produce a *Vaughn* index, an OPLA GILD attorney must first manually group pages of the productions into

documents, determine the document title, and then appropriately document the underlying reason for each FOIA exemption applied.  ICE produces very thorough *Vaughn* indexes, which describe the document and all redacted information in sufficient detail, without divulging sensitive, confidential, or privileged content.  This is a labor-intensive process requiring an OPLA GILD attorney to spend many hours comparing redacted and un-redacted versions of documents, aided by no software/programs or paralegals.

Typically, due to the extremely large page counts of litigation productions, ICE produces *Vaughn* indexes based on sampling – either 500 pages or 10% of the actual production, whichever is less.  In this case, ICE reviewed approximately 4,700 pages of responsive materials for Plaintiff.  Normally, on a document set of this size, ICE and the Plaintiff would settle on, at most, a 500-page sampling for the *Vaughn* (usually the first 250 pages of two productions or first 100 pages of 5 productions, to be chosen by Plaintiff), to be completed within six to twelve weeks by ICE, depending on complexity and length of documents.   Instead, in this case, the Plaintiff had initially stated that after extensive review, they have narrowed down the *Vaughn* sample to 1,500 pages.  While this is already an unusually large *Vaughn* sample (32% of the total pages), it is especially large given that out of 4,700 pages, ICE released approximately 2,407 pages in full; referred 107 pages to CBP; marked 283 pages as duplicates and 83 pages as non-responsive; and only applied partial redactions to 1,762 pages and withheld 149 pages in full (77 of which were withheld in full as draft documents under FOIA Exemption b(5)).  Therefore, Plaintiff is requesting that ICE create a *Vaughn* index for over 80% of the pages containing redactions.  This goes against the spirit and utility of *Vaughn* sampling, which is to promote judicial efficiency by reducing voluminous FOIA productions to a manageable size and allowing

the Court to extrapolate the conclusions from this representative sample to the entire population of produced documents.

OPLA GILD creates the *Vaughn* indexes for all of ICE's FOIA litigations, of which there are currently 126 cases.  Due to an over 300% increase in FOIA litigations over the past three years, and the fact that FOIA litigations only comprise part of an OPLA GILD attorney's entire portfolio and workload, OPLA GILD attorneys currently have extremely high workloads and must appropriately manage expectations given their current status.  Using the framework of six to twelve weeks for a *Vaughn* index of 500 continuously-numbered pages, ICE notes that a 1,500 page, non-continuous-numbered *Vaughn* index, would take at least 6 months to produce, if not longer, and would be at least 50 pages long.  As such, ICE has proffered a 500-600 page sampling to Plaintiff, with a secondary supplemental *Vaughn* index if necessary, but that proposal was recently rejected with Plaintiffs' counterproposal of a 750 page Vaughn index, followed by a secondary *Vaughn* index of an unspecified size.  However, a *Vaughn* index must be accompanied by a declaration from the agency, all in the context of a motion for summary judgment.  Accordingly, ICE is unsure of how a multi-stage *Vaughn* would fit into this schedule.  ICE maintains that the appropriate and judicious approach is to have the Plaintiff accept a *Vaughn* sample of 500-600 pages, which is well above the 10% total page count.

Dated:  September 17, 2019                     Respectfully submitted,

                                               FOR THE PLAINTIFFS

                                               _____
                                               Lia Ernst
                                               ACLU Foundation of Vermont
                                               P.O. Box 277

Montpelier, VT 05601
802-223-6304
lernst@acluvt.org

Josh Stehlik*
Sarah Kim Pak*
National Immigration Law Center
3435 Wilshire Boulevard, Suite 1600
Los Angeles, CA 90010
213-639-3900
stehlik@nilc.org
kimpak@nilc.org

Trudy Rebert*
National Immigration Law Center
PO Box 721361
Jackson Heights, NY 11372
646-867-8793
rebert@nilc.org

Claudia Wilner*
National Center for Law and Economic Justice
275 Seventh Avenue, Suite 1506
New York, NY 10001-6860
212-633-6967
wilner@nclej.org


* Appearing *pro hac vice*




FOR THE DEFENDANTS:

CHRISTINA E. NOLAN
United States Attorney

By: _____
Michael Sady (BBO #552934)
Assistant U.S. Attorney
John Joseph Moakley
United States Courthouse, Suite 9200
1 Courthouse Way
Boston, MA 02210
(617) 748-3362
Michael.sady@usdoj.gov

13